**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN MAXWELL,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Civil Action No. 23-23001 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Petitioner John Maxwell's motion to vacate sentence brought pursuant to 28 U.S.C. § 2255 (ECF No. 1), and Petitioner's supplemental motion to vacate sentence (ECF No. 17). Following an order to answer, the Government filed responses to the motions (ECF Nos. 12, 18), to which Petitioner replied (ECF Nos. 16, 20). For the following reasons, this Court will deny Petitioner's motion and supplemental motion to vacate sentence and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction, the Third Circuit described the facts underlying this matter as follows:

> This case has its roots in organized crime, and, like other mob cases, it gets its start with family – both biological and made. Nicodemo Domenico "Little Nicky" Scarfo Sr. was the "boss" of the Philadelphia branch, or "family," of La Cosa Nostra ("LCN") for most of the 1980s. He oversaw nearly a decade of murders, gambling, and extortion for the benefit of LCN.

By the time [Petitioner and his co-defendants] here began their FirstPlus scheme, however, he was out of the game, serving a lengthy prison sentence[.] His son, Nicodemo Salvatore "Nicky" Scarfo[,] wanted to fill the power vacuum, but his attempted takeover of the Philadelphia LCN family did not go according to plan. On Halloween 1989, as he was having dinner at a restaurant, masked assailants ambushed him, shooting him several times but, no doubt to their chagrin, not killing him.

When he recovered, Scarfo sought the help of the Lucchese LCN family, which operated in northern New Jersey. He had an "in" with the Luccheses: their boss was incarcerated in the same prison as his father. According to the government's expert on the structure and operations of LCN, eventually the Lucchese family integrated Scarfo into their organizations as a "made member" – someone who has been "fully inducted" and has "taken an oath of loyalty to the family." Being a made member meant that he had to generate money for the Lucchese family and share with it the profits of any criminal activities he pursued.

Scarfo's longtime friend Salvatore Pelullo, although not a blood relative, had a close relationship not only with Scarfo but with Scarfo's father[,] too. The older Scarfo treated Pelullo as his nephew. Pelullo became an "associate" of the Luccheses – a criminal colleague who hadn't been formally initiated into [the family's] ranks." The government's expert testified that an associate like Pelullo had to "share . . . the profits of any of [his] criminal activity" with the family, and he had to answer to a made member, such as Scarfo, who would "supervis[e] and direct[]" any of his actions.

Before the events at issue in this case, Scarfo and Pelullo had each earned criminal convictions. Scarfo was convicted in 1990 of assaulting a woman in a hospital elevator, and then in 1993 for racketeering conduct. In 2002, he was convicted of running an illegal gambling business. Pelullo, meanwhile, was convicted of bank fraud and making false statements to the [Securities & Exchange Commission ("SEC")] in 1999. Three years later, he pled guilty to wire fraud.

. . . .

In 2007, Scarfo and Pelullo stumbled on "the golden vein of delas" – an opportunity that seemed so lucrative, they thought they could ride it into retirement. That opportunity was FirstPlus, a Texas-based mortgage company whose main operating subsidiary had recently exited bankruptcy after falling on hard times.

Following that restructuring, FirstPlus began receiving periodic, multi-million-dollar "waterfall" payments from its bankruptcy trust.[] At that point, it was essentially a dormant parent company receiving the waterfall payments but doing no business.

After the payments started coming in, a former FirstPlus employee, Jack Roubinek, had the idea to locate investors and gain control of FirstPlus. In early 2007, he contacted his attorney, William Maxwell, and asked him to research the possibility of investing in FirstPlus. At around the same time, Pelullo learned about FirstPlus from his business acquaintance David Roberts, a mortgage broker from Staten Island. A group including Pelullo, Roberts, Scarfo, Roubinek, and Gary McCarthy (Pelullo's attorney and eventual codefendant) gathered in Philadelphia to discuss a potential takeover of FirstPlus.

At first, according to Roberts, their thinking was "to try to raise money to buy [FirstPlus's] stock[.]" That plan, however, fell through: the group realized that none of them had the money needed to buy the stock. Luckily for them, however, FirstPlus had recently fired Jack Draper, a high-ranking employee. Draper had griped about his firing to Roubinek – the two having become acquainted while employed at FirstPlus – and to William Maxwell.[] Those three were joined by Roberts and Pelullo for a meeting in Dallas, where Draper, bearing a grudge, told the group he was willing to "divulge all" and accuse the FirstPlus board and CEO Daniel Phillips of financial improprieties.

That "completely changed the direction of the plan." Seeing an opportunity, Pelullo, who was emerging as the leader of the takeover group, worked with William Maxwell to send letters to Phillips and other board members. The letters were purportedly written by Draper and threatened that he would go to "the FBI, the IRS[,] the U.S. Attorney's [O]ffice[,] [FirstPlus's] Bankruptcy's attorney and the SEC" with claims of financial misconduct including bribery, money laundering, and Sarbanes-Oxley violations.[] They also threatened to tell Phillips's wife – who was then divorcing him – that Phillips had raped an assistant and used the company's moneys to pay off the victim when she got pregnant. According to Phillips, all those claims were false, but he was nonetheless concerned that their dissemination would cause grave damage to his and the company's reputations.

The letters had their intended effect. Phillips met with William Maxwell and Pelullo, who indicated the allegations would be dropped if Phillips and the FirstPlus board handed the business over to them. Evidently, it was an offer he couldn't refuse.

Phillips swiftly persuaded the entire board to give up their positions rather than try to engage in what would be a messy and expensive fight with Pelullo's group. Pelullo then selected a new board of directors for FirstPlus: William Handley (a friend of Pelullo's who took over as Chief Financial Officer), [Petitioner] John Maxwell (William Maxwell's brother and the titular Chief Executive Officer), Roberts (who became secretary of the company), Harold Garber (Scarfo's father's attorney, who became the new board chairman), and Robert O'Neal (one of William's clients, who later succeeded Garber as chairman).[] The necessary corporate formalities were followed and, on June 7, just four days after sending the threatening letters, Pelullo and his cronies had total control of the company.

. . .

With FirstPlus in their power, the new officers and directors went to work – making the company work for them. Pelullo, along with William Maxwell, controlled the show. They even obtained stamps of the directors' signatures so they could run the looting scheme without interference.

The board entered into a "legal services agreement" with William, who became FirstPlus's "special counsel." The contract formally granted him significant power within the organization. It purportedly gave him "[a]ll legal authority for any matter involving" FirstPlus; the power to select and retain legal counsel, accountants, and, "in [his] sole discretion," "any and all consulting firms"; and the right to "spend funds, incur legal expenses, and to expend fees in excess of [his] retainer and to seek reimbursement[.]" He could also "restrict disclosure of the information . . . to any person[,]" including the members of the board. For his supposed labors, William made $100,000 a month, plus expenses of up to $30,000.

With that authority, William hired Pelullo as a consultant to FirstPlus, a role that shielded him from public scrutiny. In practice, though, Pelullo was the "de facto president" of the company, according to FirstPlus's public auditor, Anthony Buczek. John Maxwell was named as CEO, but he largely functioned under Pelullo's control.

Using his controlling position at FirstPlus, and with William's help, Pelullo set up several channels through which money flowed out of FirstPlus's accounts and into his and Scarfo's coffers. For one, Pelullo set up a bogus trust that ostensibly had his children as its beneficiaries. In practice, however, according to

codefendant Cory Leshner, the trust was "created for the purposes of owning" Seven Hills Management, LLC, a company with Pelullo's brother-in-law, Alexander Lyubarskiy, listed as its head.[] Lyubarskiy's supposed management of Seven Hills was strictly for show; "[e]verything he did was at the direction of Mr. Pelullo."

William Maxwell, on FirstPlus's behalf, retained Seven Hills to provide FirstPlus with "consulting services." The agreement entrusted Seven Hills (and, through it, Pelullo) with a "litany of duties" that Leshner summarized as "helping run the entire operation" of FirstPlus. Seven Hills was compensated $100,000 each month plus $15,000 in expenses.

Scarfo, meanwhile, profited from FirstPlus as well. Like Pelullo, he set up a trust that was nominally intended to "benefit[] [his] daughter" but in actuality served as a vehicle for his own gain. That trust, in turn, owned Learned Associates of North America, LLC ("LANA"); both entities were run "[o]n paper" by Scarfo's cousin and codefendant John Parisi. That was a ruse to keep Scarfo's name off the books; "[i]n reality," it was Scarfo, not Parisi, who controlled the trust and LANA. LANA enabled Scarfo to get in on the take through a secondary consulting agreement between LANA and Seven Hills. The agreement obliged LANA to perform for FirstPlus "exactly the same" tasks that Seven Hills was already being paid to do, according to an FBI investigator. In practice, LANA performed no work, but the deal entitled LANA (and, through it, Scarfo) to a roughly one-third cut of what Seven Hills was getting from FirstPlus. As the government puts it, those payments were "effectively 'tribute'" to Scarfo.

Those arrangements were all facilitated by William Maxwell, to whose attorney trust account the consulting fees and expenses were wired. William generally passed those on to Seven Hills, which in turn sent $33,000 a month, plus so called expenses, to LANA. Pelullo was "completely involved with" and oversaw the flow of money from FirstPlus to Maxwell and on to the consulting firms.

Pelullo and Scarfo also profited from FirstPlus by having it acquire three shell companies they owned. First up was Rutgers Investment Group, LLC, an unsuccessful mortgage loan provider majority owned by LANA and Seven Hills. Rutgers's single source of revenue was receivables it supposedly got from Shore Escapes, a defunct vacation sales company also owned by Seven Hills and LANA. It was make-believe money, but on June 7, the new team's first day in office, Pelullo got approval for the acquisition from the

FirstPlus board, and the following month FirstPlus bought Rutgers for approximately $1.8 million and 500,000 FirstPlus shares.

Two more acquisitions of companies owned by Seven Hills and LANA followed soon after. FirstPlus bought Globalnet Enterprises, LLC, a financially struggling cleaning company, for around $4.5 million and more than one million shares of FirstPlus stock. It then paid $725,000 – including $100,000 directly to each of Seven Hills and LANA – to buy The Premier Group, LLC, a company Pelullo set up in May 2007 to hold the assets of a company at least nominally in the business of representing the interests of insurance policyholders.

Pelullo made sure that FirstPlus bought his and Scarfo's companies on preposterously favorable terms. To conduct valuations of the target business, he brought in Kenneth Stein, the head of a business brokerage firm. Stein told Pelullo that [Stein] was unqualified to perform the valuations, but Pelullo said to "[j]ust get it done[.]" Though Stein believed the companies' financials were "horrific" and "atrocious," Pelullo pressured him into preparing nominally "independent" valuation reports that overvalued the businesses. William Maxwell covered up Pelullo's involvement by listing his own name on the engagement letters and handling Stein's payments.

Also helping grease the skids were two of Pelullo's attorneys – David Adler and Gary McCarthy. Although FirstPlus's public filings said that the acquisitions were "completed on an arms-length basis" that was not even remotely true. Pelullo had his lawyers on both sides of the negotiating table, with Adler representing FirstPlus and McCarthy representing the shell companies.

In the meantime, Scarfo, Pelullo, and William Maxwell began to take advantage of their ill-gotten gains. Scarfo bought a house and expensive jewelry for his wife; Pelullo purchased a Bentley automobile; Scarfo and Pelullo together bought a yacht; and William and Pelullo had FirstPlus acquire a plane for their personal use. The scheme was working as planned.

Still, the fact that FirstPlus was a public company, with disclosure requirements under federal securities laws, added complications to the looting. To get around those requirements, Pelullo hired Anthony Buczek as FirstPlus's auditor, based on a referral by Howard Drossner, who later became a codefendant. Pelullo pressured Buczek into hiding or obscuring material information about the company – such as the Rutgers and Globalnet acquisitions, the consulting agreements, and Pelullo's prior federal

fraud convictions[] – even though FirstPlus was required to disclose that information in its SEC filings.

. . .

The party had to come to an end, and eventually the actions of the FirstPlus thieves caught up with them. While investigating a tip that Scarfo was again trying to gain control of the Philadelphia LCN, the Federal Bureau of Investigation became aware of the mob ties and suspicious circumstances surrounding the resignation and replacement of FirstPlus's former board. As FBI agents dug deeper, they came to believe – rightly – that Pelullo and Scarfo were behind the FirstPlus takeover and would systematically steal from it. They obtained court permission to track the defendants' locations through their cellphones and wiretap their calls over the course of several months. Among the calls the agents picked up were communications between Pelullo and his lawyers (Maxwell, McCarthy, and Donald Manno). To weed out any discussions protected by Pelullo's attorney-client privilege, the government asked the District Court to review in camera the records of wiretaps assembled by a special "filter team" before they were transmitted to prosecutors[] – all, of course, unbeknownst to Pelullo.

The conspirators eventually came to suspect that they were under investigation. For example, while on a long drive from Dallas to deliver a gun to Scarfo's house in New Jersey, John Maxwell suspected that the government had agents following him in a car and in a helicopter.

The government's investigations escalated on May 8, 2008. That day, the FBI executed search warrants at thirteen locations across the country, including FirstPlus's offices in Texas and the defendants' homes, offices, and law firms in Pennsylvania and New Jersey. They also seized the plane, the Bentley, and the yacht, along with guns they found on board the yacht and more guns and ammunition found at Scarfo's and Pelullo's homes and Pelullo's office. It took another three years for the government to obtain an indictment from a grand jury, but that day did arrive. In unpacking the evidence and building their cases, prosecutors set up additional filter teams to review the evidence recovered from McCarthy's and Manno's law offices and to set aside anything that was privileged before turning the rest over to the team handling the prosecution of the defendants.

. . .

> When Scarfo, Pelullo, and their co-conspirators took over the company in early June 2007, FirstPlus had almost $10 million in its accounts, and it received a $4.4 million waterfall payment later that year. By the following May, when the FBI seized the accounts, there was less than $2,000 left. Between the fraudulent consulting and legal-services agreements channeled through bogus trusts and the acquisitions of virtually worthless companies, the conspirators had bled FirstPlus dry. It soon fell into bankruptcy, leaving its more than 1,200 public stockholders with the company's husk.

*United States v. Scarfo*, 41 F.4th 136, 157-62 (3d Cir. 2022) (internal citations and record citations omitted).

## II. LEGAL STANDARD

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied*, 444 U.S. 865 (1979); *Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## III. DISCUSSION

### A. No Evidentiary Hearing Is Necessary In This Matter

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth*, 432 F.3d 542, 545-56 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *Gov't of V.I. v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546. Because Petitioner's claims are all either barred or clearly without merit for the reasons expressed below, no evidentiary hearing is necessary in this matter.

### B. Petitioner's Structural Error Claim

Petitioner argues that the trial court committed a structural error because a number of exhibits were not formally entered into evidence at trial. Rather, certain exhibits were added to the documents contained on tablet computers provided to the jury. Structural errors are a rare category of trial error in which a defect in a trial is so fundamental that it affects "the framework within which the trial proceeds" and demands a conviction be overturned regardless of a lack of clear prejudice to the defendant. *See United States v. Greene*, 431 F. App'x 191, 194-96 (3d Cir. 2011); *see also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (noting the very limited field of errors that constitute structural errors such as the complete denial of counsel). Structural errors are thus not subject to harmless error analysis as prejudice must be presumed. *See Fulminante*, 499 U.S. at 310. The classes of errors deemed structural are exceedingly limited. *Id.* This Court is aware of no case finding that the improper provision of an unadmitted exhibit to the jury during

deliberations is necessarily a structural error. Relevant Circuit Court caselaw has instead treated such an occurrence as a standard trial error subject to harmless error analysis, which requires a showing of prejudice to warrant relief even on direct appeal. *See, e.g.*, *United States v. Lee*, 573 F.3d 155, 162 (3d Cir. 2009); *United States v. Streeval*, 70 F. App'x 646, 650 (3d Cir. 2003) (quoting *Gov't of V.I. v. Joseph*, 685 F.2d 857, 864 (3d Cir. 1982)); *United States v. Jenkins-Watts*, 574 F.3d 950, 963-64 (8th Cir. 2009); *United States v. Samak*, 7 F.3d 1196, 1197 (5th Cir. 1993). Thus, to the extent that Petitioner contends that the error was structural, he is mistaken. Petitioner's claim cannot warrant habeas relief absent a showing that, at the very least, the alleged error had a substantial and injurious effect on the jury's verdict at trial. *Fry v. Pliler*, 551 U.S. 112,115-16 (2007).

As it is clear from the record that the issue of the unadmitted exhibits was discovered after trial, and Petitioner could have raised this claim on direct appeal but did not, Petitioner's unadmitted exhibit claim is procedurally defaulted.[1] As "[h]abeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal,'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Sunal v. Large*, 332 U.S. 174, 178 (1947)), any claim which could have been, but was not, raised before the trial court or on direct appeal is considered procedurally defaulted for the purposes of a § 2255 motion. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Frady*, 456 U.S. 152, 167-68

---

[1] Even if Petitioner's claim did amount to a structural error, that would only entitle Petitioner to a presumption of prejudice; Petitioner's claim would still be subject to the procedural default bar in this habeas matter. *See Johnson v. Pinchak*, 392 F.3d 551, 566 n.6 (3d Cir. 2004) (rejecting a claim as procedurally defaulted while declining to determine whether the claim in question was structural); *Dedona v. United States*, No. 08-2046, 2009 WL 2778386, at *4-5 (D.N.J. Aug. 31, 2009) (rejecting argument that structural errors could proceed regardless of timeliness and finding motion alleging structural errors time barred); *see also Montes v. Nash*, 179 F. App'x 824, 825 (3d Cir. 2006) (stating that inability to raise a structural error claim which is procedurally barred under § 2255 is insufficient to permit a petitioner to evade the second or successive motion bar).

(1982); *Parkin v. United States*, 565 F. App'x 149, 151-52 (3d Cir. 2014). A petitioner may not obtain relief on a defaulted claim unless he shows either that he is factually innocent of the charged offenses or shows cause and actual prejudice sufficient to overcome his default. *Parkin*, 565 F. App'x at 151-52; *Lawrence v. United States*, No. 18-16006, 2023 WL 6392918, at *1 (D.N.J. Oct. 2, 2023). Cause in this context requires that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim." *Id.* at 151 (quoting *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005)). Even where he shows cause, a petitioner will still not be entitled to relief unless he shows actual prejudice, *i.e.*, that the alleged errors "worked to his actual and substantial disadvantage infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Establishing actual innocence sufficient to overcome the default bar instead requires a petitioner show that "in light of all the evidence it is more likely than not that no reasonable juror would have convicted him," *i.e.*, that he is factually innocent. *Bousley*, 523 U.S. at 623-24. As Petitioner does not attempt to show cause and prejudice and merely asserts that no reasonable juror could have found him guilty of the crimes charged, his claims are barred and cannot serve as a basis for relief in this habeas matter.

Even if Petitioner's claim regarding the unadmitted exhibits was not barred, Petitioner would still not be entitled to relief. In his claim, Petitioner takes issue with several hundred exhibits, most if not all of which were audio recordings of intercepted communications between members of the conspiracy or between conspiracy members and co-defendant Scarfo's father. They were used at trial but never formally offered or admitted into evidence. Instead, they were uploaded onto tablets provided to the jury during deliberations. Petitioner provides no valid basis for the exclusion of these documents from evidence, and it is clear that had the issue been known to the parties—all of whom had access to and did not object to the list of exhibits provided to the jury—the Government would readily have rectified the error and had the exhibits admitted.

This issue was first raised in post-trial motions while Petitioner's appeal was being briefed. During an April 23, 2019 conference, the Honorable Robert B. Kugler, U.S.D.J. (ret.) described the way in which exhibit admissions had been handled at trial as follows:

> The court doesn't, never had and probably never will keep an official exhibit list. The official record of the exhibits is that which is found in the transcript. Every transcript has an entry for every exhibit that's been introduced successfully in evidence and there's an index of them. Having said that, in this case, the court also never retains exhibits. In this case the way we handle the exhibits [was] at the end of each week. . . I asked counsel and I appointed Mr. Catanzaro as the defense liaison counsel for exhibits to make sure that those exhibits that had been introduced were successfully uploaded into our system. And at the end of the trial I made sure all counsel were in accord as to what was uploaded and each and every one of you said that it had been examined and it was, you agreed that the exhibits that we had uploaded into our system [for jurors to view] were those exhibits which had been successfully introduced in evidence and I got that from[] agreement from everybody on the record.

(Appellate Joint Appendix, Third Circuit Docket No. 15-2811 at ECF No. 174 at E3866.)

Counsel for co-defendant Scarfo brought to Judge Kugler's attention the issue of discrepancies between the exhibit list uploaded by the parties and provided to the jury, and the exhibits formally entered into evidence at trial. Judge Kugler noted that during the trial, parties regularly forgot to enter things into evidence as they were discussed or played and entered them later, and that many exhibits were entered into evidence in batches. (*Id.* at E3891.) When defense counsel raised the issue of unadmitted exhibits being placed before the jury, Judge Kugler further noted that counsel had been in charge of making sure only admitted exhibits were uploaded for juror viewing. He stated that defense counsel was supposed to have been checking frequently to make sure there were no missed exhibits, and that exhibits were only permitted to go to the jury after all parties had assured the Court that all the uploaded exhibits were proper. (*Id.* at E3891-92.) Judge Kugler further noted that defense counsel had an opportunity to object to any evidence

before it was viewed by the jury during trial, and that he had resolved each objection which had been made. (*Id.* at E3893-94.)

This discussion makes clear that defense counsel were provided opportunities to oppose or object to any of the exhibits used at trial, were given ample opportunity to challenge any exhibit which went to the jury prior to deliberations if there were questions of its provenance, and that counsel did not raise the issue until several years after the trial had been completed and while Petitioner's direct appeal was being briefed. The record also makes clear that any failure to formally move exhibits into evidence prior to them being uploaded on tablets for juror view during deliberations was inadvertent, with both defense counsel and the Government under the impression that everything had been properly admitted. Given the absence of any clear basis to suggest that any of the exhibits were inadmissible or would have been excluded had the admission issue been timely raised, it is also clear that the only issue here is that the Government unintentionally failed to complete the formal procedural act of admitting the challenged exhibits into evidence prior to the close of trial.

While it is "ordinarily the responsibility of counsel to check the exhibits [admitted into evidence at trial] and failure to object in a timely manner can under some circumstances constitute a waiver," the Third Circuit has permitted criminal defendants on direct appeal to challenge the provision of unadmitted documents to the jury where counsel did not object prior to deliberations *provided* the defendant can show that there was error, it was plain, the error affected the defendant's substantial rights, and the error was not harmless. *See, e.g.*, *Streeval*, 70 F. App'x at 650 (quoting *Joseph*, 685 F.2d at 864). Where the error cannot be said to be harmless, even the inadvertent provision of extraneous overly prejudicial unadmitted documents, annotations, or contraband may support the overturning of a conviction. *See, e.g., Lee*, 573 F.3d at 162; *Joseph*, 685 F.2d at 864 (finding that the submission of a letter and signed confession which had not been

presented during trial but directly corroborated a contested witness's version of events to the jury during deliberations was plain error warranting reversal). Where exhibits are presented to the jury but not formally admitted during the course of trial, and all parties assumed their admission before the exhibits were provided to the jury, reversal (even on direct appeal) is not warranted absent a showing that the jurors' access to the materials "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *See, e.g.*, *Streeval*, 70 F. App'x at 650-51; *see also Jenkins-Watts*, 574 F.3d at 963-64 (finding that submission to the jury of unadmitted demonstrative exhibit which jury had previously seen but which was not entered into evidence during trial was not plain error warranting reversal); *accord Samak*, 7 F.3d at 1197.

On habeas review, an error will not warrant relief merely for meeting the plain error standard. Instead, an error, even of constitutional dimension, will generally only provide a basis for habeas relief in a collateral attack proceeding where the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 115-16. Petitioner's case did not involve an extraneous or outside item being secreted or accidentally provided to the jury. Rather, it involved exhibits, prepared for use during trial, being uploaded for jury access without formally being entered into evidence, without objection, and with the parties apparently believing at the time that all items had been properly entered over the course of a lengthy trial that contained innumerable documents, recordings, and exhibits. Many of these exhibits also reiterated information provided in witness testimony. None of these exhibits were truly new, extraneous, or inadmissible. Petitioner's case is thus far afield from cases finding plain error on direct appeal, *see Joseph*, 685 F.2d at 864, and far more akin to those excusing minor procedural errors regarding documents being entered into evidence which failed to affect the fairness or integrity of a petitioner's trial. *Streeval*, 70 F. App'x at 650-51; *see also Jenkins-Watts*, 574 F.3d at 963-64.

In light of the overwhelming evidence of the guilt of Petitioner and his co-defendants provided at trial, the procedural posture of this claim, and the fact that the jury had already been exposed to the information contained in the recordings during trial, the Court concludes that any error in failing to formally enter exhibits into evidence was not capable of having a substantial and injurious effect on the jury's verdict. *Fry*, 551 U.S. at 115-16. Any such error was thus harmless and not a basis for habeas relief. *Id.* Petitioner's claims asserting that he was denied a fair trial by the submission of various unadmitted exhibits, or that his rights were impugned when those documents were considered in post-trial motions or on appeal, are thus without merit.

**C. Petitioner's Challenge to the 18 U.S.C. § 922(g) Charge**

Petitioner next contends that his conviction for conspiracy to provide a weapon to a felon is invalid following the Supreme Court's decision in *New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96 (2023), *judgment vacated sub nom.*, *Garland v. Range*, --- U.S. ---, 144 S. Ct. 2706 (2024). Essentially, Petitioner contends that § 922(g) is unconstitutional in light of *Bruen* and *Range*, and he is therefore innocent of the crime of conspiring to provide a handgun to a convicted felon.

In *Bruen*, the Supreme Court clarified the standard applicable to challenges to the constitutionality of statutes that are alleged to violate the Second Amendment. In dealing with such challenges, courts must first determine "whether the text of the Second Amendment applies to a person and his proposed conduct" and, if it does, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," chiefly by considering statutes and regulations in effect at or near the founding of the United States. *Bruen*, 597 U.S. at 19, 31-33. Following the remand of its original decision in *Range*, the Third Circuit again considered the constitutionality of § 922(g) in *Range v. Attorney General (Range II)*, 124 F.4th 218 (2024). In that case, the Court of Appeals determined

that an individual with only a single non-violent and relatively minor felony conviction (for lying on an application for food stamps decades earlier), who desired to purchase commonly held firearms for hunting and self-defense, was among the people protected by the Second Amendment. *Id.* at 228-29. The Third Circuit further held that a complete and lifelong deprivation of the right to purchase and keep commonly held firearms for an individual under those circumstances did not comport with the Nation's tradition of firearms regulations—including early republic surety laws and other limitations on dangerous individuals' possession of weapons—and thus was unconstitutional as applied to that individual. *Id.* at 231-32. The Court of Appeals premised this holding, however, on two facts—first, that Mr. Range had long since completed all aspects of his criminal sentence, and second, that he had not used a weapon to commit the convicted offense. *Id.*

While *Range II* considered only whether the statute was constitutional as applied to an individual with a decades old non-violent, non-weapon conviction who had completed his sentence, that decision left open whether individuals who had completed their custodial sentence but remained on probation or supervised release were also protected by the guarantees of the Second Amendment. The Third Circuit answered that question in the negative in two companion cases: *United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025), and *United States v. Moore*, 111 F.4th 266 (3d Cir. 2025). In those two cases, the Court of Appeals held that individuals who were still serving a probationary, parole, or supervised release term at the time of the challenged conduct could lawfully be prevented from owning or possessing firearms *at least* until the supervised release or parole term was complete. *Moore*, 111 F.4th at 270-72; *Quailes*, 126 F. 4th at 221-22.

Thus, even if the holding of *Range II* was read to apply more broadly than to just those with a completed non-violent felony conviction sentence, it is clear that *Range II* is not so broad as to render § 922(g) unconstitutional as applied to those, such as Petitioner's co-defendant Scarfo, who were still serving a supervised release term at the time of the conspiracy in question.

Petitioner's conduct, which led to his conviction for conspiracy to violate § 922(g), stemmed from his buying and transporting a firearm from Texas to Scarfo in New Jersey. As it is clear that Scarfo remained a prohibited person, and Petitioner's conviction stems from his overt action of providing a firearm to Scarfo, *Bruen*, *Range*, and their progeny do not support Petitioner's contention that his conviction was unlawful, and Petitioner's claim on that basis is meritless.

Even were this not the case, Petitioner's claim is also procedurally defaulted insomuch as it could have been, but was not, raised on direct appeal, and is otherwise barred by the concurrent sentence doctrine. "Under the concurrent sentence doctrine, a court has 'discretion to avoid resolution of legal issues affecting less than all counts in an indictment if at least one will survive and sentences on all counts are concurrent.'" *Parkin*, 565 F. App'x at 152 (quoting *United States v. McKie*, 112 F.3d 626, 628 n.4 (3d Cir. 1997)); *see also Duka v. United States*, 27 F.4th 189, 194-95 (3d Cir. 2022) (extending doctrine to cases involving a consecutive sentence in a habeas proceeding where victory on the claim asserted would not change the fact or length of the petitioner's sentence in light of an unchallenged life sentence); *Gardner v. Warden Lewisburg USP*, 845 F.3d 99, 104 (3d Cir. 2017). This doctrine serves as an independent basis to decline to review a collateral attack, so long as success on the claim would not alter the length of the petitioner's detention in light of the concurrently imposed sentences, and the petitioner fails to show that there are other unique continuing consequences from the challenged count which would warrant a decision on the merits. *Duka*, 27 F. 4th at 195-96.

Because a habeas petitioner may not use a collateral challenge to his conviction to attack fines, fees, or special assessments and may instead only challenge the fact or length of his detention, the concurrent sentence doctrine remains applicable to § 2255 claims that challenge a charge for which the petitioner received a sentence the same length or shorter than that received on another concurrent sentence. *Id.* Here, Petitioner received a 120-month sentence for his RICO

conspiracy conviction, as well as his convictions for conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering charges; and a concurrent 60-month sentence on his firearms conspiracy and securities fraud conspiracy charges, for a total custodial sentence of 120 months. (*See* Amended Judgment, Docket No. 11-740 at ECF No. 1308.) As Petitioner received a concurrent sentence on the firearms conspiracy conviction which is shorter than the 120-month sentence received for the RICO, wire fraud, and wire fraud conspiracy charges of which Petitioner was convicted, this Court must decline to provide relief on this claim even if it had been of greater merit.

**D. Petitioner's *Ciminelli* and *Dubin* claims**

Petitioner next argues that his fraud convictions should be overturned in light of the Supreme Court's decisions in *Ciminelli v. United States*, 598 U.S. 306 (2023), and *Dubin v. United States*, 599 U.S. 110 (2023). As with his *Bruen* and *Range* arguments discussed above, Petitioner could have but did not raise these claims on direct appeal. Both *Dubin* and *Ciminelli* were cases largely concerned with statutory text and building upon preexisting precedent and the claims within them could easily have been pressed prior to those decisions. *See Ciminelli*, 598 U.S. at 312-16; *Dubin*, 599 U.S. at 118-20. These claims, consequently, are procedurally defaulted. Notwithstanding that default, both claims are without merit.

*Dubin* was concerned with the proper interpretation of the text of a federal identity fraud statute that Petitioner was never charged with having violated. *Dubin*, 599 U.S. at 118-20. It also concerned statutory language—the "use" of identification "in relation to" a predicate act of healthcare fraud—which meaningfully differs from the requirement that a person who commits wire or mail fraud use the mails or wires in furtherance of a fraudulent scheme. The use of the wires or mails "need not be an essential element of the scheme" in a wire or mail fraud case, and it is "sufficient for the mailing [or use of the wires] to be incident to an essential part of the scheme

. . . or a step in [the] plot." Mail and wire fraud lack the statutory requirements applicable to the identity theft at issue in *Dubin*. *See Schmuck v. United States*, 489 U.S. 705, 710-11 (1989). *Dubin* is inapplicable to this case and is of no benefit to Petitioner. Petitioner's assertion that *Dubin* requires the disturbance of his conviction is thus without merit and serves as no basis for habeas relief.

Petitioner's *Ciminelli* claim also fails to provide a basis for habeas relief. In *Ciminelli*, the Supreme Court rejected the Second Circuit's "right-to-control" theory of wire fraud. Under that theory, a criminal defendant could be convicted of mail fraud for depriving an individual of his interest in controlling his own assets "by depriving [him] of information necessary to make discretionary economic decisions." *Ciminelli*, 598 U.S. at 313-16. In so doing, the Supreme Court reiterated that the mail and wire fraud statutes reach only criminal conduct in which the fraud deprives the victims of "traditional property interests," such as money or physical property. *Id.* Here, Petitioner was neither charged, nor prosecuted, under a right to control theory. Instead, he was prosecuted under the theory that he and his co-conspirators had used mail and wires to deprive FirstPlus and its shareholders of their money and property—specifically, the money in the company's coffers and received in further windfall payments.

Petitioner takes issue with jury instructions which suggested, for the purposes of the extortion predicate act for RICO, that property would include the board positions vacated by the outgoing board during the scheme, which Petitioner asserts amounts to a right to control theory of property. The trial judge, however, *did not* give that particular instruction regarding the mail or wire fraud acts and charges. The trial judge instead instructed the jury that the Government had to prove that the fraud scheme was designed to deprive another of "money or property." (Docket No. 11-740 at ECF No. 1064 at 138, 145, 151.) The record thus does not necessarily support the conclusion that a reasonable jury given that instruction would have concluded that it could find

conspiracy to commit or actual mail fraud based solely on the efforts to seize the board seats. That instruction was instead related entirely to the extortion count of the RICO charge.

Even if the Court were to assume that a juror may have been given the incorrect impression from the charge that property, for the purposes of the fraud counts, could include the board seats discussed in relation to the extortion acts, any such error was harmless. The evidence in this matter demonstrated that the conspirators took from FirstPlus several million dollars and that their purpose in taking over and mismanaging FirstPlus was designed to obtain its monetary accounts. Given the charge indicating that wire or mail fraud required proof of an intent to obtain money or property from the victim, it is clear that the outcome would have been no different had the trial judge made greater efforts to clarify that the board seats did not count as property for the purposes of the fraud counts and could only be considered for the extortion RICO predicate act. The Court has no doubt on this record, given the strong evidence of guilt provided at trial for Petitioner and his co-conspirators, that the allegedly flawed or misleading instruction was not capable of having a substantial and injurious effect on the jury's verdict. Thus, any purported error was harmless. *Fry*, 551 U.S. at 115-16. Petitioner's *Ciminelli* claim consequently serves as no basis for habeas relief.

**E. Petitioner's Supplemental Claim Premised on *Macquarie***

In his supplemental motion to vacate sentence, Petitioner argues that his securities fraud conspiracy conviction cannot stand in light of the Supreme Court's ruling in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024). Petitioner argues that *Macquarie* rendered pure omissions in securities filings nonactionable under Rule 10b-5, and that his crime is therefore void as Petitioner believes he was convicted solely based on pure omissions in securities filings.

Initially, the Court notes that Petitioner vastly overstates the holding of *Macquarie*. "The question presented in *Macquarie* was exceedingly narrow: 'whether the failure to disclose information required by Item 303[2] can support a private action under Rule 10b-5(b), *even if the failure does not render any 'statements made' misleading.*'" *Sjunde AP-Fonden v. Gen. Electric Co.*, No. 17-8457, 2024 WL 2124504, at *1 (S.D.N.Y. May 10, 2024) (quoting *Macquarie*, 601 U.S. at 249-60). Even after *Macquarie*, any omission which renders affirmative statements misleading made in an Item 303 disclosure remains the proper subject of action under Rule 10b-5. *Id.* The omissions at issue in Petitioner's case made affirmative statements in SEC filings misleading. For example, they misled investors as to who was in charge of FirstPlus after the co-conspirators took over. In addition, they completely omitted the control that Pelullo, Scarfo, and their associates had over the company, and did not involve Item 303 disclosures specifically. Petitioner's assertion that *Macquarie* is helpful to him is, therefore, at best, extremely dubious. *See, e.g.*, *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347-55 (S.D.N.Y. 2024) (noting that post-*Macquarie* it remains unlawful under Rule 10b-5 to make omissions which render other provided information materially misleading). Even aside from the merits, because Petitioner could have presented this claim on appeal based on the plain text of the applicable rules and pre-existing Third Circuit precedent which stood for similar propositions, this claim appears to be procedurally defaulted. *See, e.g.*, *Macquarie*, 601 U.S. at 264-65 (describing ruling as a logical outcome of the plain text of the relevant rules and statutes); *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).

---

[2] Item 303 requires the disclosure of "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in periodic SEC filings. 17 C.F.R. § 220.303(b)(2)(ii).

Even if Petitioner's *Macquarie* claim were of greater merit and Petitioner could show a basis to evade the procedural default bar, this Court must decline to review Petitioner's *Macquarie* claim under the concurrent sentencing doctrine. Like his firearms conspiracy conviction, Petitioner received a concurrent 60-month sentence on his conspiracy to commit securities fraud conviction. This was made concurrent to his 120-month sentence on the remaining counts, which would remain intact even if his securities conviction were vacated. Petitioner's *Macquarie* claim is thus barred by the concurrent sentence doctrine and serves as no basis for habeas relief in this matter. *See Duka*, 27 F.4th at 195-96.

**F. Petitioner's Ineffective Assistance of Counsel Claims**

In his final ground for relief, Petitioner raises a number of claims in which he asserts that his counsel was constitutionally deficient. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's

> performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his chief claim, Petitioner contends that counsel proved ineffective in failing to adequately prepare for trial and failing to adequately investigate his case. As a result, counsel failed to call a number of witnesses at trial, including: Petitioner; Petitioner's brother and co-defendant, William Maxwell; Petitioner's sister and William's former assistant, Vivian Huntsman; and a number of other individuals. As one court in this District has explained,

> [i]n *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of

> constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); *see also United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).
>
> Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,
>
> > a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result."
>
> *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).

The Court first turns to the issue of the witnesses Petitioner alleges that counsel should have called. It is axiomatic that counsel, rather than the criminal defendant, determines which witnesses to call at trial, and courts "are required not simply to give [the] attorney[] the benefit of the doubt [in making that decision], but [must] affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did." *Judge*, 119 F. Supp. 3d at 284-85

(quoting *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014)). Where the decision not to call a witness amounts to a legitimate trial strategy in light of the facts of an individual case, counsel's decision is "virtually unchallengeable." *United States v. Graves*, 613 F. App'x 157, 159-60 (3d Cir. 2015) (quoting *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)). A habeas petitioner may not establish prejudice on such a claim unless he can provide a sworn statement or sworn affidavit from the uncalled witness setting forth the testimony that would have been provided had he testified at trial. *Judge*, 119 F. Supp. 3d at 285; *Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001).

In this matter, Petitioner has provided sworn affidavits only as to three potential witnesses: himself, his co-defendant brother, and his sister. Although Petitioner faults counsel for also failing to call several other witnesses at trial,[3] he provides no affidavits from those witnesses, and thus cannot establish prejudice as to counsel's alleged failure to investigate. Any claim that counsel should have discovered or called any witness other than the three who provided sworn affidavits is thus without merit and serves as no basis for habeas relief. *Judge*, 119 F. Supp. 3d at 285; *Duncan*, 256 F.3d at 201-02.

Petitioner asserts that he wanted to testify at trial. According to Petitioner, his counsel failed to advise him, and he only chose not to testify after a co-defendant's counsel suggested to him that testifying in his own defense would be a poor choice. Petitioner thus asserts that his decision not to testify was the direct result of counsel's lack of preparation and advice on how and about what to testify. Putting aside that it was Petitioner who ultimately decided not to testify at

[3] Through his brother's affidavit, Petitioner identified potential witnesses including his defense investigator, FirstPlus's controller, Pelullo's former secretary, and several other individuals involved with or in FirstPlus and the takeover scheme. Petitioner provides only William's assertions, however, as to what these purported witnesses could have said or that they were willing to testify on his behalf.

trial, and it appears that Petitioner largely made that decision in discussions with someone other than his *own* attorney,[4] Petitioner cannot show that he was prejudiced by counsel's lack of encouragement or preparation.

More to the point, at the close of testimony, the trial judge held a colloquy with Petitioner regarding his decision not to testify on his own behalf. (*See* Docket No. 11-740 at ECF No. 1057 at 148.) During that colloquy, the trial judge reiterated that the decision of whether or not to testify was Petitioner's and his lawyer had stated that Petitioner did not wish to testify on his own behalf. (*Id.*) The trial judge also gave Petitioner an opportunity to express a desire or intention to testify or raise qualms regarding the decision, but Petitioner declined to express any concerns or qualms. The trial judge therefore concluded that Petitioner had been advised about his rights and chose not to testify after discussing the issue with counsel. (*Id.*) Accordingly, Petitioner was given the opportunity at trial to express any concern or lack of advice regarding the decision not to testify and declined to do so. This colloquy stands in stark contrast to the assertions Petitioner now makes and strongly undercuts the allegations in his current motion to vacate sentence. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 73-75 (1977) (conclusory allegations contradicting the clear trial record of a colloquy between the petitioner and trial judge are generally subject to summary dismissal in the absence of "compelling reasons for questioning [the] truth" of the statements made during the colloquy).

[4] Petitioner suggests that he may have a claim of ineffective assistance against the attorney of one of his co-defendants who spoke with him and influenced his decision not to testify on his own behalf, and for not informing Petitioner of a pending criminal investigation against him on his own behalf. Mr. Farrell was not Petitioner's attorney but instead Pelullo's and did not owe Petitioner any duty to act on his behalf. Petitioner's rights, therefore, were not violated by any informal advice from Mr. Farrell because Petitioner has no right to the effective assistance of third parties who are not his own lawyer.

Turning to Petitioner's specific claims regarding his alleged desire to testify at trial, Petitioner identifies many things on which he wished to testify, but many of these points were either immaterial to the charges he faced or would have been unlikely to affect the outcome of trial. A large portion of Petitioner's proposed testimony involves his spin on the history of FirstPlus from the perspective of one previously involved in the company. This purported testimony, however, is largely self-motivated well poisoning. The proposed testimony constitutes an attempt to: (1) paint FirstPlus and its predecessor company as engaged in abusive lending practices; (2) paint the previous board members as bad actors engaged in self-dealing; and (3) insinuate that at least some of the accusations contained in the blackmail material used against the board may have been based on fact. None of this testimony, however, was truly germane to the charges at hand. That FirstPlus or its prior board may not have been of sterling character is immaterial to whether Petitioner and his co-conspirators usurped the previous board and drained the company of all value while lining their own pockets (facts clearly demonstrated by the evidence presented at trial). *See Scarfo*, 41 F.4th at 159-60, 196-99. Likewise, that Petitioner may have engaged in some actual business practices does not obviate his guilt, nor would his day-to-day dealings have had any clear effect on the jury's verdict. Petitioner, therefore, was not prejudiced by the absence of this testimony at trial. *See, e.g.*, *Pisa v. Blanks*, 197 F. App'x 586, 588 (9th Cir. 2006) (petitioner cannot be prejudiced by the lack of speculative, superfluous, or irrelevant testimony at trial).

Other testimony Petitioner suggests he would have provided was directly contradicted by the evidence in the record and thus would not have affected the jury's findings. Petitioner's testimony that the FBI's investigation, rather than the actions of the co-conspirators, robbed the company of value is directly contradicted by the draining of the company of millions of dollars much of which was funneled to Pelullo and ultimately Scarfo. The timing of the FBI's actions

also does not align with this loss of money. Likewise, although Petitioner suggests he did not know that Pelullo and Seven Hills were sending money to Scarfo and LANA, the record contains several recordings and conversations which show that Petitioner was, or should have been, aware of Scarfo's role in the plot. Petitioner providing a firearm to Scarfo also indicates that he was aware that Scarfo was involved. *Scarfo*, 41 F.4th at 196-97. Even were it true that Petitioner did not know how much or to what extent Pelullo paid off Scarfo, that would have been of no moment. Petitioner need not have been aware of all of his co-conspirators' misdeeds to be found guilty as charged. *See United States v. De Peri*, 778 F.2d 963, 975 (3d Cir. 1985) (a "conspirator need not . . . be aware of all the details of the conspiracy to be found to have agreed to participate in it"); *see also United States v. Fattah*, 914 F.3d 112, 165-67 (3d Cir. 2019). Likewise, regardless of whether Petitioner "relied on counsel" in signing securities documents, the record makes it clear that he was present and aware of the objection to the securities filings on the basis that they did not disclose Pelullo's involvement. Thus, Petitioner was directly aware of the materially misleading information contained in those filings, and reliance on counsel would not spare him of guilt for signing those filings.

The rest of Petitioner's purported testimony is vague and short on detail. Petitioner claims he would have testified as to investigations, research, and other aspects of the operations of FirstPlus which he believes would have undercut his guilt. These conclusory allegations are insufficient to show that the jury's verdict likely would have been different had he been better prepared and chosen to testify on his own behalf. That Petitioner was prepared to cast aspersions on others involved and to try and place all the blame on Pelullo and others would have been a transparent attempt to shift blame and would have had little value in light of the considerable evidence of guilt—and Petitioner's own involvement and wrongdoing—in the FirstPlus takeover and implosion which occurred on Petitioner's watch. Given the numerous recordings and

conversations in the record making it clear that Petitioner was Pelullo's willing stand-in as CEO of FirstPlus, and was directly involved in the extortionate takeover and strip mining of FirstPlus, any decision by Petitioner to testify would almost certainly have backfired by subjecting him to considerable cross-examination on his obvious involvement in the scheme. Given the vague, clearly contradicted, or immaterial nature of Petitioner's proposed testimony, Petitioner has not shown that the jury's verdict would have been different had counsel better prepared him and had Petitioner therefore chosen to testify on his own behalf. Petitioner thus cannot show that counsel was ineffective in this regard.

Petitioner's claims regarding his brother's testimony also fail to demonstrate prejudice. William Maxwell proffers that he would have testified that the initial effort to buy FirstPlus failed not for a lack of funds—as stated in testimony at trial—but because of a required disclosure and delay pursuant to SEC rules. Even if this were true, William provides only a conclusory allegation and no detailed information on how the stock would have been purchased and does not provide any clear indication that they actually possessed the money to purchase FirstPlus. The exact reason the initial legitimate purchase plan failed is largely immaterial to the ultimate facts of the case. The co-conspirators abandoned any plan to legitimately pursue FirstPlus and instead fell back on extortion, took over the company, and drained the company of its value. Likewise, William states he would have given phone calls their "proper context" but does not describe in any detail which of the "some 18,000 phone calls" he would have discussed or how his spin on those calls would have had any actual effect on the jury's verdict at trial. William also suggests he would have provided contrary evidence regarding Pelullo's threats, despite the testimony regarding those threats from the person who was himself threatened, and William's apparent belief that Pelullo's "tough guy" act was merely a façade for Scarfo's benefit. This testimony at best would have been of marginal benefit. The very idea in question—that Pelullo's persona was largely a show—was

already placed into evidence during the cross-examination of Cory Leshner and obviously did not prevent the jury from finding both brothers and their co-conspirators guilty.

That William may have had a legitimate basis for his legal fees was also largely immaterial. Regardless of his history and litigation skills, the record still indicates that he was involved in the scheme to take over FirstPlus, used his consulting authority to "hire" Seven Hills through which considerable amounts of money were funneled to Pelullo and in turn Scarfo, and covered up their misdeeds in false filings to the SEC which obscured Pelullo's control of the company. *See Scarfo*, 41 F.4th at 159-60, 26196-99. That William Maxwell may have been a talented lawyer who could command fees in the range provided for with his contract with FirstPlus is thus largely immaterial. Likewise, that Maxwell would have testified that he believed that Globalnet had at least some value because he and his brother saw a "warehouse full of [unspecified] equipment" which purported to belong to Globalnet, is little more than a vague and undetailed allegation and is of little, if any, value. Ultimately, it is clear from the record that there is no reasonable likelihood that the outcome of trial for Petitioner would have been different had William Maxwell testified at trial. Petitioner therefore cannot show that counsel was ineffective for failing to investigate and present the information proffered by William Maxwell at trial.

Petitioner was also not prejudiced by counsel's failure to call his sister, Vivian Huntsman, at trial. According to her affidavit, Huntsman, at most, would have disputed what some of the payments to Seven Hills covered, such as aircraft costs. Further, she would have suggested that Petitioner's brother William may have been in court for part of the process of preparing SEC filings. In addition, she would have provided vague information about her interactions with the other co-conspirators. (ECF No. 2 at 118-20.) Huntsman also avers that she would have asserted that neither of her brothers "joined any conspiracy" as part of their dealings with FirstPlus. (*Id.*) This testimony, vague and undetailed as it is, would have been of exceedingly little value at trial.

Huntsman's credibility would have been open to question given her family and employment loyalties to her brother. Moreover, any assertion that the Maxwells did not join in on the FirstPlus conspiracy is flatly contradicted by considerable evidence in the trial record. Likewise, that she may have had a schedule which would have placed William in court on certain dates would not undercut trial testimony regarding his involvement in the false securities filings. The witness who testified about the meeting in question did not give an exact date or time and testified that William was involved in at least one of these conversations over the telephone. The scheduling information, therefore, would have been of little help in showing that William was not involved in the conversations regarding the securities filings. Because it is not likely that her testimony would have had any effect upon the outcome of Petitioner's trial, he was not prejudiced by counsel's alleged failure to call Huntsman, who admits that she was at the time unwilling to testify because of the possibility of being charged as part of the scheme. Petitioner, therefore, cannot show that counsel was ineffective in failing to pursue Huntsman as a trial witness.

Having considered the purported testimony of the Maxwell brothers and Huntsman, and the overwhelming evidence of guilt presented at trial, the Court must conclude that Petitioner was not prejudiced by counsel's alleged failure to conduct further investigations prior to trial. Although the Maxwells fault counsel for not presenting an affirmative defense at trial, including their testimony, their proffered testimony is highly unlikely to have affected the jury's verdict because it would have opened both brothers up to cross-examination and confrontation with their own statements in various recordings. The brothers do not provide any basis for an effective affirmative defense beyond their testimony that counsel could have pursued had he conducted further

investigation.[5] As such, Petitioner has not demonstrated that counsel was ineffective for failing to pursue further investigations or for failing to elicit the alleged testimony proffered by the witnesses because Petitioner cannot show that he was prejudiced. Petitioner's claim on this basis thus provides no basis for habeas relief.

Petitioner also asserts that counsel proved defective at trial, after trial, and on appeal in not raising the issue of the unadmitted exhibits discussed above. Given the nature of the system used at trial and the fact that no one discovered the discrepancy until well after trial had concluded, it is somewhat doubtful that the issue could have been raised at trial. Had the issued been raised at trial, however, the Government would have merely moved those exhibits into evidence at that point in time, which Judge Kugler almost certainly would have permitted considering the practice of batch admitting exhibits. In addition, the admissibility of the exhibits was clear following pretrial motions, and Petitioner has provided no basis upon which to exclude the exhibits from trial. Thus, Petitioner was not prejudiced by counsel's failure to object to the unadmitted exhibits at trial.

Petitioner's claim fairs no better in the post-trial or appellate context. While appellate counsel's decisions are subject to the same ineffective assistance standard applicable to trial counsel claims, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d

[5] Petitioner's filings suggest that he believes, apparently, from conversations with his investigator that *any* affirmative defense case would have been better than relying on cross-examination only to make out a defense, but his own trial belays that assumption. Pelullo was convicted after making an affirmative case, while several other charged individuals were acquitted without putting on an affirmative defense. Without clear evidence that would likely have changed the outcome at trial, Petitioner cannot show that counsel provided ineffective assistance in failing to put on a defense case beyond cross-examination and argument. Given all the evidence against Petitioner and his co-conspirators, and the considerable efforts of all defense counsel in this matter to oppose the Government's case, it is exceedingly doubtful a better case was available to be made.

Cir. 1996) (citing *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)), and appellate counsel need not raise every nonfrivolous claim a defendant wishes to pursue. *Jones v. Barnes*, 463 U.S. at 751. Because the chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success, *id.* at 751-52; *Smith v. Murray*, 477 U.S. 527, 536 (1986), the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Petitioner has not shown that his unadmitted exhibit claim is stronger than the numerous claims counsel did pursue on direct appeal, claims which resulted in a lengthy, published Third Circuit opinion. Had the issue been raised as a claim for relief post-trial[6] or on direct appeal, the claim would have failed for the reasons stated above.

Even under a plain error standard, the inadvertent failure to formally admit exhibits that were otherwise in the record and were used or discussed at trial would not be a basis for relief in light of the considerable evidence of the guilt of Petitioner and his co-defendants, and counsel cannot be ineffective in failing to raise a meritless objection or claim. *See United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) (finding that counsel cannot be ineffective in failing to raise a meritless objection); *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (same). Petitioner's unadmitted exhibits claim thus fails to provide a basis for habeas relief even when considered as a claim of ineffective assistance of counsel. Petitioner's claim is therefore without merit. As all of Petitioner's claims are either meritless or barred for the reasons discussed above, Petitioner's motion to vacate sentence is denied.

---

[6] The issue *was* discussed post-trial during a conference with Judge Kugler, albeit not as a stand-alone basis for relief. The issue was also mentioned in the appellate briefs filed by at least one of Petitioner's co-defendants, although not as a clear stand-alone claim for appellate relief.

## IV CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Because all of Petitioner's claims are meritless or barred for the reasons expressed above, Petitioner has failed to make a substantial showing of a denial of a constitutional right, and his motion is not adequate to receive encouragement to proceed further. The Court therefore denies Petitioner a certificate of appealability.

## V. CONCLUSION

For the reasons set forth above, Petitioner's motion to vacate sentence (ECF No. 1) is **DENIED**, Petitioner's supplemental motion (ECF No. 17) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** September 16, 2026